1
2
3
4
5

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

6
7
8
9
10
11

G.O.,[1]

          Plaintiff,

    v.

ANDREW SAUL,

          Defendant.

Case No.  19-cv-01829-JCS

**ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 14, 15

## I.    INTRODUCTION

      Plaintiff G.O. brought this action seeking judicial review of the final decision of Defendant Andrew Saul, Commissioner of Social Security (the "Commissioner") denying G.O.'s application for disability benefits after a hearing before an administrative law judge (the "ALJ").  The parties filed cross-motions for summary judgment pursuant to Civil Local Rule 16-5.  For the reasons discussed below, G.O.'s motion is GRANTED, the Commissioner's motion is DENIED, and the matter is REMANDED for further administrative proceedings consistent with this order.[2]

## II.    BACKGROUND

### A.    Procedural History

      On August 7, 2013, G.O. filed a Title II application for a period of disability and disability insurance benefits, alleging an onset date of October 15, 2012.  *See* Admin. Record ("AR," dkts. 10, 13)[3] at 67.  G.O.'s claim was initially denied on November 22, 2013 and upon reconsideration

---

[1] Because opinions by the Court are more widely available than other filings, and this order contains potentially sensitive medical information, this order refers to the plaintiff only by his initials.  This order does not alter the degree of public access to other filings in this action provided by Rule 5.2(c) of the Federal Rules of Civil Procedure and Civil Local Rule 5-1(c)(5)(B)(i).
[2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all purposes pursuant to 28 U.S.C. § 636(c).
[3] Pages 1 through 492 of the administrative record are filed as docket entry 10.  Pages 493 through

United States District Court
Northern District of California

1    on February 3, 2014. *Id.* He then filed a written request for a hearing on April 3, 2014. *Id.* G.O.,

2    represented by his attorney Brian Sudano, and vocational expert ("VE") Robert Cottle appeared

3    and testified before ALJ Mary Parnow on August 3, 2015. *Id.* ALJ Parnow issued an unfavorable

4    decision on September 14, 2015, finding that G.O. had not been under a disability from the alleged

5    onset date to the date of the decision, as defined in 20 C.F.R. § 404.1520(g). *Id.* at 76. G.O. did

6    not appeal this decision. *See* Pl.'s Statement of Facts (dkt. 14) at 1–2.

7        G.O. filed a second application for disability benefits on December 7, 2015, which was

8    initially denied on March 6, 2016 and denied again on reconsideration on April 22, 2016. AR at

9    15. He then filed a written request for a hearing on May 25, 2016, which was held before ALJ

10   Debra Underwood on September 14, 2017. *Id.* G.O., represented again by Brian Sudano, and VE

11   Carly Coughlin appeared and testified. *Id.* ALJ Underwood issued an unfavorable decision on

12   January 25, 2018. *Id.* at 24. The Social Security Administration Appeals Council considered and

13   denied G.O.'s request for review on November 2, 2018. *Id.* at 3–5; Pl.'s Statement of Facts ¶ 6;

14   Def.'s Statement of Facts at 9, ¶ 6.

15       G.O. filed the present action on April 4, 2019, pursuant to 42 U.S.C. § 405(g), which

16   grants the Court jurisdiction to review the Commissioner's final decision. *See* Pl.'s Motion (dkt.

17   14) at 1.

18       **B.    Regulatory Framework for Determining Disability**

19       When a claimant alleges a disability and applies for Social Security benefits, the ALJ

20   evaluates their claim using a five-step process. 20 C.F.R. § 404.1520(a)(4). At step one, if the

21   claimant has engaged in "substantial gainful activity" during the alleged period of disability, they

22   are not disabled. 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity is "work activity that

23   involves doing significant physical or mental activities . . . for pay or profit." 20 C.F.R.

24   § 220.141(a)–(b). If the claimant has not engaged in such activities, the evaluation continues at

25   step two.

26       At the second step of the analysis, if the claimant has no "severe medically determinable

27

28   513—the transcript of G.O.'s August 3, 2015 administrative hearing—are included in a
     supplemental filing as docket entry 13.

1  impairment," they are not disabled.  20 C.F.R. § 404.1520(a)(4)(ii).  Impairments are severe when

2  there is "more than a minimal limitation in [the claimant's] ability to do basic work activities."  20

3  C.F.R. § 404.1520(c).  If the claimant does not suffer from a severe impairment, they are not

4  disabled; if they have a severe impairment, the evaluation continues to step three.

5      Next, the ALJ turns to the Social Security Administration's listing of severe impairments

6  (the "Listing").  *See* 20 C.F.R. § 404, subpt. P, app. 1.  If the claimant's alleged impairment meets

7  or medically equals the definition of a listed impairment, the claimant is disabled.  20 C.F.R.

8  § 404.1520(a)(4)(iii).  If not, the evaluation proceeds to step four.

9      At step four, if—based on the claimant's residual functional capacity ("RFC")—the

10  claimant can still perform their past work, they are not disabled.  20 C.F.R. § 404.1520(a)(4)(iv).

11  The RFC is a determination of "the most [the claimant] can do despite [the claimant's]

12  limitations."  20 C.F.R. § 404.1520(a)(1).  If the ALJ finds that the claimant can perform their past

13  relevant work, they are not disabled; if they are not able to perform such work, the evaluation

14  moves to step five.

15      For the fifth and final step, the burden shifts from the claimant to prove disability to the

16  Commissioner to "identify specific jobs existing in substantial numbers in the national economy

17  that the claimant can perform despite [his] identified limitations."  *Meanel v. Apfel*, 172 F.3d

18  1111, 1114 (9th Cir. 1999) (citing *Johnson v. Shalala*, 60 F.3d 1428, 1432 (9th Cir. 1995)).  If the

19  Commissioner can identify work that the claimant could perform, they are not disabled; if not, the

20  claimant is disabled and entitled to benefits.  20 C.F.R. § 404.1520(g)(1).

21      **C.   Plaintiff's History**

22      The following summary of G.O.'s medical records focuses on records identified by the

23  parties and the ALJs relevant to his alleged disability.  It is not intended as a complete recitation of

24  either the administrative record or G.O.'s medical history.

25          **a.   Medical History Before 2015 Administrative Decision**

26      G.O. is a 58-year-old man who previously worked in construction as a carpenter.  AR at

27  22.  He is high-school educated and attended night school at a junior college for one year.  *Id.* at

28  39–40.  G.O. was laid off in July 2010 because of a lack of work and has not engaged in

3

1   substantial gainful activity since then.  *Id.* at 40–41.  G.O. alleges a disability onset date of

2   October 15, 2012, which is when he first noticed pain in his dominant right shoulder and knew

3   "there was a severe problem where . . . [he] couldn't use it without having pain, all the time."  *Id.*

4   at 41.

5          In December 2012, G.O. sought medical attention from Dr. Charles Renner for "decreased

6   range of motion and increased pain in his right shoulder," especially with "rowing motion[s]."  *Id.*

7   at 71, 227.[4]  G.O. was prescribed Naprosyn, an anti-inflammatory drug, which "seemed to help"

8   with his pain.  *Id.*  G.O. then sought medical attention from Dr. Douglas Lange on March 5, 2013.

9   *Id.* at 225.  Dr. Lange's examination indicated stiffness and pain in G.O.'s shoulder joint,

10  especially with overhead motions and movements away from the body, and reported that x-rays

11  showed hardening of the supraspinatus muscle—which is related to the rotator cuff—and

12  downsloping of the acromion bone at G.O.'s shoulder blade.  *Id.* at 71.

13         On the recommendation of Dr. Lange, G.O. had an MRI taken of his right shoulder on

14  March 16, 2013.  *Id* at 228.  Dr. George Tischenko took the MRI, which revealed hardening of the

15  supraspinatus muscle, possible partial thickness tear or rim tear along the supraspinatus, and mild

16  shoulder joint osteoarthritis with swelling of the bursa, which prevents friction between bones and

17  tissues.  *Id.* at 71.  During a follow-up appointment on March 25, 2013, Dr. Tischenko noted that

18  G.O. had pain after activity and positive impingement signs (which can indicate rotator cuff

19  injury) but "no atrophy, negative Spurling signs, symmetric reflexes, normal range of motion, no

20  apprehension, no instability, intact neurosensory function, and 'absolutely normal' rotator cuff

21  strength at 5/5."  *Id.*  During this appointment, Dr. Tischenko discussed rotator cuff tear treatment

22  options, which included surgical debridement of the subacromial bursa, prolonged recovery, and

23  rehabilitation programs.  *Id.*  G.O. elected a more conservative treatment option, comprised of

24  cortisone shots and physical therapy.  *Id.*  G.O. began physical therapy treatments twice-weekly in

25  April 2013.  *Id.*  On April 22, 2013, Dr. Tischenko found that G.O.'s right shoulder strength was

26

27  [4] Certain documents from G.O.'s first application, specifically documents detailing G.O.'s medical
    appointments and findings from December 2012 through February 2014, were not included in the
28  record.  As such, the Court relies on ALJ Parnow's description of G.O.'s medical history during
    this period.

*United States District Court*
*Northern District of California*

1   normal in all planes, with normal range of motion, and no impingement pain.  *Id.* at 72.  G.O. was

2   encouraged to continue the current treatment plan, and surgery was not recommended.  *Id.*

3   　　　In December 2013, G.O. reported to Dr. Tischenko that his pain was five out of ten "at the

4   top of the [right] shoulder consistent with persistent impingement syndrome."  *Id.*  Dr. Tischenko

5   administered G.O.'s second cortisone shot and ordered an additional round of physical therapy.

6   *Id.*  Dr. Tischenko also noted that if this round of treatment failed, G.O. would need to consider

7   rotator cuff repair surgery.  *Id.*

8   　　　On January 8, 2014, G.O. was diagnosed with rotator cuff tendinitis/bursitis.  *Id.*  G.O.

9   resumed physical therapy to improve range of motion, strength, and posture, but reported that the

10  second cortisone shot merely provided "mild relief."  *Id.*  His symptoms at the time were

11  "aggravated by using a computer mouse, pushing, pulling, lifting to shoulder height, and

12  sleeping," which were generally eased by Norco, Naprosyn, and ice.  *Id.*  G.O. reported being a

13  caregiver for his parents mainly as a driver, and that he hired help for cooking and cleaning.  *Id.*

14  　　　In February 2014, G.O.'s physical therapist noted that he cared for his mother, but had

15  "strength and range of motion limitations due to pain."  *Id.*  The physical therapist also noted that

16  G.O. was capable of managing his pain with medication and activity modifications; however he

17  still "experienced sharp immediate pain in performing overhead or outstretched arm positions."

18  *Id.*  During an appointment with Dr. Tischenko on April 16, 2014, G.O. reported that his pain was

19  three out of ten, but that the past three months of physical therapy had not improved his

20  functioning.  *Id.* at 341.  After a physical examination, Dr. Tischenko reported decreased motion

21  and positive impingement signs, and that G.O. "continues to have significant symptoms" that "are

22  slowly worsening."  *Id.*  Dr. Tischenko did not recommend more cortisone shots because they

23  failed to help alleviate G.O.'s pain, but instead recommended possible surgical decompression and

24  rotator cuff repair.  *Id.*  He also reported that G.O. was unable to return to work as a carpenter and

25  took care of his ailing parents.  *Id.*  Medications at the time included Advil, Naprosyn, and Norco.

26  *Id.*

27  　　　On January 29, 2015, G.O. established care with Dr. Daniel Moring-Parris.  *Id.* at 288.  Dr.

28  Moring-Parris noted that G.O. had a torn right rotator cuff and was considering surgery, but "can't

United States District Court
Northern District of California

5

be incapacitated now" because he takes care of his father.  *Id.*  At a follow-up appointment on February 25, 2015 with Dr. Moring-Parris, G.O. reported that he continued to have right shoulder pain, but declined cortisone injections.  *Id.* at 292.

On May 8, 2015, G.O. returned to Dr. Tischenko for a physical examination.  *Id.* at 339. G.O. reported pain in his right shoulder that radiated down his arm with impingement signs, and pain with reaching overhead, backward, and laterally.  *Id.*  During the appointment, G.O. reported that his pain was a seven out of ten.  *Id.* at 420.  Dr. Tischenko noted test results indicating shoulder impingement.  *Id.* at 339.  Additionally, the physical examination revealed "no atrophy, negative Spurling sings, normal range of motion, no apprehension, no instability, intact neurosensory function, and full rotator cuff, tricep, and bicep strength at 5/5."  *Id.*  G.O. was diagnosed with subacromial impingement syndrome, and recommended either to continue his conservative treatment plan or pursue surgery.  *Id.*  G.O. stated that he was "not prepared to proceed to surgery," as he still took care of his father and could not "be unable to use his right arm for 6-9 months."  *Id.*

In June 2015, G.O. began another round of physical therapy, and the physical therapist noted that G.O. had decreased range of motion and participation in activities of daily living, increased right shoulder restriction, chronic pain, and fear of further injuring his shoulder.  *Id.* at 300.  The physical therapist also noted that G.O. was the "primary caregiver for his father who is ill and needs 24hr care."  *Id.* at 298.  G.O.'s therapy goals at the time included getting back to work without pain and regaining the ability to throw a baseball.  *Id.* at 299.  During a physical therapy appointment on August 5, 2015, G.O. reported that his shoulder was feeling "okay," but that he still experienced pain.  *Id.* at 318.  At his last physical therapy appointment on August 12, 2015, G.O. reported that his pain was two out of ten and that he made "modest improvements with respect to ROM [range of motion]."  *Id.* at 321.  The physical therapist noted that G.O. remained guarded and fearful of worsening his condition, but demonstrated independence with his home exercises and had fair progress towards his impairments and functional limitations.  *Id.*

### b.  Initial Administrative Hearing and Decision

G.O.'s first application for disability benefits was denied initially on November 22, 2013

6

1    and on reconsideration on February 3, 2014. *Id.* at 67. ALJ Mary Parnow held a hearing on

2    August 3, 2015, where G.O. appeared and testified, along with VE Robert Cottle. *Id.* ALJ

3    Parnow issued an unfavorable decision on September 14, 2015, finding that G.O. was not disabled

4    under the Social Security Act. *Id.* at 76.

5                                  **i.  G.O.'s Testimony**

6           G.O. testified that his mobility issues with his right shoulder prevent him from returning to

7    work as a carpenter because he struggles reaching above and behind, and with lifting any weight

8    with his right arm away from his body. *Id.* at 499. G.O. previously worked for a general

9    contractor "doing everything from concrete forms, safety survey layout, fencing," and general

10   carpentry work. *Id.* at 497. G.O.'s average workday consisted of lifting objects between forty and

11   eighty pounds, and occasionally objects over one hundred pounds. *Id.* at 498. This work included

12   "opening gates, [lifting] fence panels . . . 2 x 4s, safety tables, safety rails," and form ply or

13   oxygen bottles. *Id.* G.O.'s average workday primarily required standing and walking, with little

14   sitting. *Id.* G.O. testified that many of his tasks included reaching and lifting objects overhead

15   about "30%, maybe 40%" of the time. *Id.* at 499.

16          G.O. testified that he first noticed pain in his right shoulder in October 2012 with reaching

17   and overhead movements, as well as performing awkward movements, like buckling a seatbelt.

18   *Id.* at 500. G.O. stated that his pain could reach an eight or nine on a ten-point scale, particularly

19   with doing motions out of reflex, but that it is generally a "dull" pain of four or five. *Id.* at 500–

20   01. G.O. also reported having trouble with simple movements, like reaching into the refrigerator

21   or lifting objects heavier than a glass of water, and that he has to be very careful in moving his

22   right arm away from his body. *Id.* at 501, 508. G.O. noted that he received two cortisone shots to

23   help mitigate his pain; the first helped for about ten weeks and that the second "did not seem to

24   have the same effect as the first." *Id.* at 502–03. G.O. also testified that physical therapy did not

25   result in any improvements, and both he and his physical therapist were concerned that continued

26   treatment would further injure his right shoulder. *Id.* at 503.

27          G.O. testified that as his father's caregiver, he mainly monitored the hired caregivers. *Id.*

28   at 504. Specifically, G.O. stated that he merely watched his father during "slow times," like when

United States District Court
Northern District of California

7

United States District Court
Northern District of California

he is napping, and made sure that if his father got up that he had his walker when hired caregivers were not present. *Id.* at 504–05. For instance, G.O. reported that when his father falls when caregivers are not present, which happens often, he cannot help him back up and must call one of the caregivers or the fire department for help. *Id.* at 507. G.O. testified that his main role was to be around "just in case of an emergency . . . to make sure nothing happen[ed]." *Id.* at 505. At the 2017 hearing, G.O. testified that he moved in with his parents in October 2013 because of his father's deteriorating health and his mother's cancer diagnosis. *Id.* at 39. He also testified that his family has employed caregivers since 2013 for the primary care of his father, and that his role was never "hands-on." *Id.* at 51.

Additionally, G.O. reported that while surgery was recommended to mitigate his right shoulder issues, he selected a different treatment plan because of concerns about the surgery's recovery time. *Id.* at 505. G.O. testified that he was afraid of being incapacitated while watching his father if something were to happen that would cause him to "react and damage" his right shoulder. *Id.* at 506. G.O. also stated that, in the event of surgery, he would have to hire additional caregivers, which he was not sure he could do and would potentially "triple the cost." *Id.*

### ii.  Vocational Expert Robert Cottle's Testimony

ALJ Parnow then called VE Robert Cottle to provide impartial testimony. *Id.* at 508. VE Cottle began his testimony by asking G.O. whether he ever kept records, managed billing, or ordered materials as part of his past work. *Id.* at 509. G.O. stated that he kept some records and timesheets, but merely wrote down material orders and did not normally use a computer as part of his job. *Id.* VE Cottle classified G.O.'s past work as a construction worker, requiring heavy work according to the Dictionary of Occupational Titles. *Id.*

VE Cottle addressed two hypotheticals. *Id.* at 510. ALJ Parnow's first hypothetical required VE Cottle to consider someone of G.O.'s age, education, and past work who could lift ten pounds frequently and twenty pounds occasionally, could only occasionally reach, push, and pull with the upper right extremity, and could perform no overhead work. *Id.* This hypothetical individual also had no sitting, standing, or walking limits, and no limits with the left upper

8

United States District Court
Northern District of California

1   extremity or lower extremities. *Id.* VE Cottle determined that this person would not be able to

2   perform G.O.'s past work. *Id.* However, VE Cottle determined that this person would be able to

3   perform other jobs in the national economy, such as a counter clerk, laminating machine operator,

4   and bakery conveyor line worker. *Id.* at 511.

5          ALJ Parnow's second hypothetical required VE Cottle to consider the same person from

6   the first hypothetical, but whose ability to reach with the right upper extremity was less than

7   occasional. *Id.* VE Cottle determined that this person would possess no transferable skills from

8   their past work in construction and would be precluded from performing any work in the national

9   economy. *Id.*

10                              **iii.   ALJ Parnow's Decision**

11         Using the five-step evaluation process to determine disability, ALJ Parnow found that G.O.

12  had not been under a disability within the meaning of the Social Security Act from October 15,

13  2012 through the date of her decision. *Id.* at 67. ALJ Parnow determined that G.O. had not

14  engaged in substantial gainful activity since his alleged onset date and possessed a severe

15  impairment of right shoulder injury with residual pain. *Id.* at 69. However, ALJ Parnow found

16  that G.O.'s severe impairment failed to meet or medically equal the severity of listing 1.02, which

17  describes the major dysfunction of a joint due to any cause. *Id.* at 70. Specifically, G.O. lacked

18  evidence of: (1) gross anatomical deformity, chronic joint pain, and stiffness with signs of

19  limitation of motion or other abnormal motion of the affected joint; or (2) joint space narrowing,

20  bony destruction, or ankyloses of the affected joint resulting in the inability to ambulate

21  effectively; or (3) involvement of one major peripheral joint in each upper extremity resulting in

22  the inability to perform fine and gross motor skills effectively. *Id.*

23         Further, ALJ Parnow determined that G.O. had the RFC to perform light work as defined

24  in 20 C.F.R. § 404.1567(b), except that he had "no sitting, standing, or walking limits, no lower

25  extremity limits, can lift and carry 10 pounds frequently and 20 pounds occasionally, can reach,

26  push, and pull with the dominant right upper extremity occasionally, and can perform no overhead

27  work with the upper right extremity." *Id.*

28         ALJ Parnow considered G.O.'s symptoms and based her conclusion on a two-step process:

United States District Court
Northern District of California

1    (1) whether there is an underlying medically determinable physical or mental impairment that

2    could reasonably be expected to produce G.O.'s pain or other symptoms and (2) the extent to

3    which they limit G.O.'s functioning.  *Id.*  After considering G.O.'s allegations about his pain and

4    symptoms, ALJ Parnow determined that G.O.'s "medically determinable impairment could

5    reasonably be expected to cause the alleged symptoms; however, [G.O.'s] statements concerning

6    the intensity, persistence and limiting effect of these symptoms [were] not entirely credible." *Id.*

7    at 71.  First, ALJ Parnow found that the medical evidence of record failed to fully support G.O.'s

8    allegation of pain and dysfunction.  *Id.*  According to ALJ Parnow, the objective findings on

9    imaging studies and the conservative and routine course of treatment, comprised of physical

10   therapy and cortisone shots, did not support G.O.'s allegations of an inability to perform all work.

11   *Id.* at 73.  ALJ Parnow found that the objective findings of record supported the determination that

12   G.O. could perform light work.  *Id.*

13        ALJ Parnow also found that G.O.'s daily activities, namely caring for his father, failed to

14   support a finding of disability.  *Id.*  ALJ Parnow found that G.O.'s act of putting off surgery to

15   care for his father "suggest[ed] a higher degree of care and activity" than alleged.  *Id.*  ALJ

16   Parnow also relied on the facts that G.O.'s medications in low dosages were effective in

17   controlling his symptoms, and that he stopped working in July 2010 for reasons unrelated to his

18   right shoulder issues.  *Id.*  In making this determination, ALJ Parnow accorded only partial weight

19   to treating physician Dr. Tischenko's June 2015 opinion, with "little weight" given to his opinion

20   "that [G.O.] could never lift 10 pounds . . . [and] was severely limited in the use of his hands,

21   arms, and fingers bilaterally."  *Id.* at 73–74.  ALJ Parnow found that this opinion was not

22   supported by the totality of the record, conservative treatment plan, and reports of G.O. caring for

23   his father.  *Id.* at 74.  ALJ Parnow similarly gave only partial weight to treating physician Dr.

24   Moring-Parris's June 2015 opinion, which mirrored that of Dr. Tischenko.  *Id.*

25        Using G.O.'s RFC, ALJ Parnow determined that G.O. could not perform any of his past

26   relevant work in construction.  *Id.*  However, ALJ Parnow found, based on the testimony of VE

27   Cottle and record evidence, that there were jobs in the national economy that G.O. could perform.

28   *Id.* at 75.  VE Cottle found that someone with G.O.'s restrictions could perform jobs requiring

1   light work, such as counter clerk and bakery worker.  *Id.*  Therefore, ALJ Parnow concluded that

2   G.O. could successfully adjust to other work in the national economy, making a finding of "not

3   disabled" appropriate.  *Id.* at 76.  G.O. did not appeal this decision.  *See* Pl.'s Statement of Facts at

4   2.

5                                          **c.   Medical History Following the Initial Administrative Decision**

6           On September 18, 2015, Dr. Moring-Parris noted that G.O. completed his last round of

7   physical therapy for his right shoulder and had not yet scheduled surgery because he was "taking

8   care of his father."  AR at 325.  G.O. reported to Dr. Tischenko on November 3, 2015 that his

9   treatment "helped but not 100%" as hoped.  *Id.* at 347.  Dr. Tischenko reported that G.O.

10  continued to have pain in his right shoulder and "difficulty reaching backwards and maybe even

11  some loss of motion."  *Id.*  The physical examination revealed significant impingement signs and

12  his last MRI scan suggested a possible partial rotator cuff tear.  *Id.*  However, G.O. continued to

13  show normal rotator cuff strength at 5/5 to internal and external rotation, as well as abduction.  *Id.*

14  Dr. Tischenko recommended surgery to G.O. again because "he has had symptoms for so long,"

15  but noted that recovery may be prolonged due to his current condition.  *Id.*  A new MRI scan was

16  ordered to determine the extent of G.O.'s right shoulder issues.  *Id.*  G.O. reported to Dr.

17  Tischenko that he would make arrangements for his father's care, whom he was "partially" caring

18  for at the time, if the MRI revealed the need for surgery.  *Id.* at 347–48.

19          On November 22, 2015, an MRI of G.O.'s right shoulder indicated the following:

20                 Interstitial tear 5 mm medial to lateral extent supraspinatus tendon
                   with mild thickening subacromial bursa and moderate to severe

21                 arthrosis of the AC joint with hypertrophy and edema distal clavicle
                   and adjacent acromion.  Chronic morphology of SLAP 2 lesion.

22                 Tenosynovitis proximal biceps tendon and degeneration of the
                   anterior inferior glenoid labrum.

23

24  *Id.* at 364.  During a follow-up appointment on December 2, 2015, Dr. Tischenko noted that the

25  MRI "suggest[ed] a high-grade partial tear" and that it revealed that G.O.'s condition was "worse

26  than that of several years ago."  *Id.* at 345.  G.O. reported that his pain was one on a ten-point

27  scale when at rest, but that he had increased pain with certain movements.  *Id.* at 352.  Dr.

28  Tischenko explained the surgery, rehabilitation, and recovery processes, as well as the fact that

1   "there is the risk of failure . . . resulting in the incomplete reduction of pain and incomplete return

2   of function . . . [which] might require reoperation or change in treatment." *Id.* at 346.  G.O. agreed

3   to proceed with surgery for his right shoulder, which occurred on December 14, 2015.  *Id.* at 345,

4   362.  Dr. Tischenko performed right shoulder arthroscopic surgery, which entailed right shoulder

5   subacromial decompression, limited debridement, and a partial synovectomy.  *Id.* at 362.  The

6   surgery revealed "tremendous thickening of the bursal tissue and a very, very thick coracoacromial

7   ligament and bony spur," which resulted in aggressive decompression of the subacromial space

8   and bone resection.  *Id.*  Dr. Tischenko reported that he did not find any tears or disruption of

9   G.O.'s rotator cuff.  *Id.* at 363.

10          On December 22, 2015 during a post-operation appointment, Dr. Tischenko noted that

11   G.O. was "doing quite well" with a good range of motion, easy passive elevation, external

12   rotation, and good strength.  *Id.* at 342.  G.O. reported that his pain was two on a ten-point scale,

13   which decreased from a level of five that was reported during an earlier post-operation

14   appointment on December 18, 2015.  *Id.* at 415, 416.

15          On January 22, 2016, G.O. reported that after his first physical therapy session post-

16   operation, he had sharp pain in his right shoulder with certain movements, like lateral reaching,

17   bringing his pain up to a level four or five.  *Id.* at 414, 470.  Additionally, on February 23, 2016,

18   G.O. reported to Dr. Tischenko that he felt he had "made some improvements," with "little to no

19   pain throughout the day with activities of daily living."  *Id.* at 369.  He reported that his pain can

20   reach five out of ten with certain movements, especially when performing physical therapy

21   exercises, making a quick movement, reaching, lifting, and twisting, but that the pain typically

22   resolves quickly.  *Id.*  G.O. denied any recent falls or trauma, as well as weakness, numbness, or

23   tingling in his right arm.  *Id.*  A physical examination revealed "overall improvements" with a

24   normal range of motion and right shoulder rotator cuff strength, but G.O. still presented mildly

25   positive impingement signs.  *Id.*  Dr. Tischenko reassured G.O. that full recovery would take four

26   to six months, and that continued physical therapy, use of anti-inflammatory medication, and ice

27   would help alleviate his symptoms.  *Id.*  At physical therapy appointments from January to March

28   2016, G.O. continued to have pain, restricted range of motion, and decreased muscle strength in

United States District Court
Northern District of California

his right shoulder.  *Id.* at 451, 465.

From April to August 2016, G.O. reported a pain level of zero to one out of ten, but that pain and weakness would occur after certain movements, like reaching in any direction and lifting heavy objects.  *Id.* at 395, 410, 413.  On May 5, 2016, G.O.'s physical therapist reported that he had difficulty lifting more than ten pounds, presented continued right shoulder pain, and decreased range of motion, strength, and function.  *Id.* at 474–75.  Further, during an appointment with Dr. Tischenko on May 27, 2016, G.O. reported that his pain increased with performing physical therapy exercises that required lifting three to five pounds overhead.  *Id.* at 397.  G.O. stated that he had increased pain with activities of daily living that required him to push or pull objects across his body or laterally.  *Id.*  Dr. Tischenko noted that G.O. had weakness with internal and external rotation, abduction and should "avoid heavy pushing, pulling, or overhead use of the right shoulder."  *Id.* at 398.

A July 2016 MRI revealed a number of abnormalities.[5]  *Id.* at 448.  On August 22, 2016, Dr. Tischenko reviewed the July 2016 MRI and reported that G.O. had normal rotator cuff strength and range of motion, but that he "certainly ha[d] an AC joint issue," including "abundant AC joint arthritis" and possible impingement.  *Id.* at 395.  G.O. received a cortisone shot to mitigate his pain.  *Id.*  G.O. was advised to avoid heavy lifting, pushing, and pulling with the right shoulder.  *Id.* at 396.  Dr. Tischenko appears to have been unaware of G.O.'s ongoing physical therapy documented elsewhere in the record, reporting that G.O. had "gone through therapy and stopped sometime in December."  *Id.* at 395.

### d.  G.O.'s Present Application and 2017 Administrative Hearing

ALJ Debra Underwood held a hearing on September 14, 2017, where G.O. appeared with his attorney.  *Id.* at 28.  ALJ Underwood and G.O.'s attorney discussed outstanding physical therapy records that were absent from the record, and she agreed to hold the record open for their submission, which occurred on September 22, 2017.  *See id.* at 31–32, 451.  ALJ Underwood and

---

[5] These included "[i]nterstitial tear supraspinatus . . . with mild thickening of the subacromial bursa," "[m]oderate AC joint arthrosis," "[c]hronic morphology of SLAP 2 lesion," "[s]ubscaularis tendinosis," "[d]egeneration anteroinferior and posterior glenoid labrum," and "[t]hickening of the biceps pulley of the mid rotator cuff interval."  AR at 448.

13

United States District Court
Northern District of California

1    G.O.'s attorney also discussed G.O.'s prior ALJ decision, which found that G.O. was not disabled.

2    *Id.* at 36.  G.O.'s attorney clarified that G.O.'s present claim differs because of changed

3    circumstances.  *Id.*  Specifically, G.O. underwent surgery to address his shoulder issues, and that

4    the lack of surgery "was one of the reasons [the prior ALJ] relied on for giving an unfavorable"

5    decision.  *Id.*  ALJ Underwood noted that she would focus on the evidence between September 14,

6    2015, the date of the prior ALJ decision, and December 31, 2015, G.O.'s date last insured, to

7    determine whether G.O.'s changed circumstances warrant a finding of disability.  *Id.* at 37.

                              **i.  G.O.'s Testimony**

9        At the 2017 hearing, G.O. testified that he had surgery to address his right shoulder issues

10   on December 14, 2015.  *Id.* at 43.  G.O. stated that he postponed surgery because he wanted to try

11   fixing his shoulder with less invasive treatment, like physical therapy and cortisone shots.  *Id.* at

12   44.  G.O. told ALJ Underwood that the surgery failed to result in the improvements he hoped for

13   and that his condition stayed the same but "may even be getting worse."  *Id.*  G.O. also testified

14   that, prior to his surgery, his doctors told him not to engage in reaching or overhead movements,

15   as well as to limit lifting and carrying.  *Id.* at 47–49.  For example, G.O. reported that he struggled

16   to take a gallon of milk out of the refrigerator without triggering pain.  *Id.* at 48.  G.O. stated that

17   he tried to keep his right arm as close to his body as possible and prevent movements in any

18   direction.  *Id.* at 49.

19       G.O. also testified that he carefully guards his shoulder to prevent re-injury, which causes

20   frequent frustration and depression because his functionality is limited.  *Id.* at 44–45.  For

21   instance, G.O. reported that simple acts, such as talking on the phone or using a computer mouse,

22   cause soreness in his right shoulder.  *Id.* at 51–52.  G.O. testified that he cannot lift any weight

23   away from his body without causing pain, and cannot lift his arm above chest level without

24   aggravating his symptoms and causing a "weird reaction."  *Id.* at 54–55

25       Due to remaining shoulder pain, G.O. testified that his injury has "pretty much stopped

26   [him] from doing about 90 percent of the things [he] like[s] to do, or can do," including both work

27   and personal activities.  *Id.* at 52.  G.O. stated these activities include:

28

United States District Court
Northern District of California

> My, god, everything I do, just like, at my dad's house . . . we need work around the house, just maintenance, painting . . . construction-like activities, just that and hobbies, or working on [my] car. Anything like that is something I can't do anymore, or mowing my own lawn, can't do that. That's all hired out. And the things that you don't really think about at the time, but then you realize you can't do it is like throw a baseball, or a football, or swing a baseball bat.

*Id.* at 52–53.  Consequently, his father's caregivers take care of all household chores, including cooking meals, cleaning, and running errands for the family.  *Id.* at 53–54.

Further, G.O. testified that he has pain medications, but tries not to use them because they bother his head, making him feel "uncomfortable" and "weird."  *Id.* at 46.  Instead, G.O. stated that when he experiences pain he lies down or uses ice to mitigate his symptoms.  *Id.*  G.O. testified that if he experiences a sharp pain from quick movements, like tripping or falling, he uses pain medication as needed about three times a month.  *Id.*  Additionally, G.O. reported that his post-operation treatment plan did not include physical therapy because it causes too much pain. *Id.* at 47.  G.O. also testified that he received more cortisone shots after his surgery, but no longer got the shots because he "exceeded" what doctors are "really supposed to give," and they did not help anymore.  *Id.* at 57.

### ii.  Vocational Expert Carly Coughlin's Testimony

VE Carly Coughlin also provided impartial testimony during the hearing.  *Id.* at 58.  The VE asked G.O. a few clarifying questions about his past work and classified his past employment as heavy carpentry work.  *Id.* at 59.  The VE stated that this position did not yield any transferrable skills to jobs at a lighter exertion level.  *Id.*

ALJ Underwood then asked the VE two hypotheticals.  First, the VE was told to consider a person of G.O.'s age, education, and past work experience who was limited to occasional reaching, pushing, or pulling with the dominant right upper extremity, and could never participate in overhead work with the right upper extremity.  *Id.*  This hypothetical person had no sitting, standing, or walking limitations, and could frequently lift ten pounds and twenty pounds occasionally.  *Id.*  The VE determined that his hypothetical individual could not do any of G.O.'s past work or any other work in the national economy.  *Id.*  The VE stated that because this hypothetical person was limited to occasional reaching, that limitation precluded all light,

1 unskilled occupations.  *Id.*

2      The second hypothetical required the VE to consider someone of G.O.'s age, education,

3 and past work who could sit for six hours in an eight hour day, stand or walk for six hours.  *Id.* at

4 61.  This hypothetical person could also lift or carry twenty pounds occasionally and ten pounds

5 frequently, occasionally push or pull with the right shoulder, and do frequent right overhead

6 reaching.  *Id.* at 61.  The VE determined that his hypothetical person could not perform G.O.'s

7 past work, but could perform other jobs in the national economy, like housekeeper, inspector and

8 hand packager, and price marker.  *Id.*  This hypothetical differs in granting the hypothetical person

9 the ability to frequently reach overhead with their right hand, which G.O.'s attorney stated G.O.

10 could not do.  *Id.* at 61–62.  G.O.'s attorney also clarified that the first hypothetical was "even

11 more than [G.O.] probably could do in actuality, given the weight that . . . the hypothetical claims

12 he could lift."  *Id.* at 62.

13                  **iii.   ALJ Underwood's Decision**

14      On January 25, 2018, ALJ Underwood determined that, despite the record evidence and

15 G.O.'s testimony, there was no change of circumstances affecting the issue of disability between

16 September 14, 2015 and December 31, 2015.  *Id.* at 16.  ALJ Underwood found that G.O. failed to

17 rebut the presumption of continuing non-disability and that he was not under a disability from his

18 alleged onset date to December 31, 2015.  *Id.*

19      In making this decision, ALJ Underwood used the five-step evaluation process to

20 determine whether G.O. was disabled during the time in question.  *Id.*  ALJ Underwood found that

21 G.O. had not engaged in substantial gainful activity since his alleged onset date, and that he had

22 one severe impairment: "right rotator cuff tear with arthrosis of the acromioclavicular (AC) joint,

23 status post subacromial decompression."  *Id.* at 18.  ALJ Underwood found that this impairment

24 "significantly limits [G.O.'s] ability to perform basic work activities."  *Id.*  However, ALJ

25 Underwood found that G.O.'s impairment did not meet or medically equal the severity of a listed

26 impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *Id.*  ALJ Underwood compared G.O.'s

27 impairment to section 1.02, the same section ALJ Parnow addressed in 2015.  *Id.*  Additionally,

28 ALJ Underwood found that G.O. had the RFC to perform less than the full range of light work

United States District Court
Northern District of California

1   under 20 C.F.R. § 404.1567(b).  *Id.*  According to ALJ Underwood, G.O. "could lift and/or carry

2   20 pounds occasionally and 10 pounds frequently; had no limitations with sitting, standing, or

3   walking; could occasionally reach, push/pull with the dominant right upper extremity; and could

4   not perform any overhead work with the right upper extremity." *Id.* at 18-19.

5        ALJ Underwood then considered G.O.'s symptoms and based her conclusion on a two-part

6   test: (1) whether there is an underlying medically determinable physical or mental impairment that

7   could reasonably be expected to produce G.O.'s pain or other symptoms; and (2) the extent to

8   which they limit G.O.'s functioning.  *Id.*  Using this process, ALJ Underwood concluded that

9   G.O.'s medically determinable impairment could cause some of his alleged symptoms, but his

10  statements concerning the "intensity, persistence, and limiting effects" were "not entirely

11  consistent with the record." *Id.* at 19–20.  Specifically, ALJ Underwood determined that the

12  record evidence, as a whole, demonstrated that G.O. was capable of performing a range of light

13  work. *Id.* at 20.  ALJ Underwood found that the medical evidence from September 14, 2015 to

14  December 31, 2015 did not demonstrate a material change in G.O.'s functioning, but rather that

15  G.O. could perform limited light work with no overhead reaching, and occasional reaching,

16  pulling, and pushing with his right arm.  *Id.* at 21.  ALJ Underwood accorded great weight to state

17  agency medical consultants Dr. Sergio Bello and Dr. P.A. Talcherkar, who both generally agreed

18  with the prior ALJ's decision that G.O. could perform light work with no overhead reaching and

19  occasional reaching, pulling, and pushing with his right arm.  *Id.*  ALJ Underwood noted that Dr.

20  Talcherkar anticipated improvement after G.O.'s surgery, but this anticipated improvement was

21  not documented in the record during the relevant period.  *Id.*

22        Further, ALJ Underwood determined that G.O.'s testimony and subjective allegations

23  during the relevant period were not supported by the record and failed to demonstrate reduced

24  functionality prior to December 31, 2015.  *Id.* at 21–22.  Record evidence indicated that G.O. was

25  the primary caregiver for his father and had deferred surgery several times because of his

26  caregiving responsibilities.  *Id.*  ALJ Underwood noted that while G.O. testified that he merely

27  monitors his father's caregivers, she found that documentary evidence indicated that his

28  involvement in his father's care was more extensive than alleged, based on medical records noting

1   that G.O. deferred his surgery based on his need to care for his father.  *Id.* (citing *id.* at 288, 292,

2   325).  Similarly, ALJ Underwood found that G.O.'s treatment records reporting pain levels

3   between zero and two on a ten-point scale, reaching no higher than five during the relevant period,

4   were indicative of greater functionality than alleged.  *Id.*

5          Even though ALJ Underwood found that G.O. could not perform any past relevant work

6   through his date last insured, she found that other jobs existed in the national economy that he

7   could perform.  *Id.*  In making this determination, ALJ Underwood chose to rely on VE Cottle's

8   testimony from 2015, rather than VE Coughlin's more recent testimony at ALJ Underwood's 2017

9   hearing.  *Id.* at 23.  VE Coughlin testified that G.O.'s limitation to occasional overhead reaching

10  would eliminate all light work, while VE Cottle testified that G.O. could still perform light work.

11  *See id.*  ALJ Underwood chose to rely on VE Cottle's testimony because it was "well-reasoned

12  and supported by Social Security Ruling (SSR) 85-15," which ALJ Underwood construed as

13  providing that only *significant* limitations on reaching may eliminate a large number of

14  occupations that a person could do otherwise.  *Id.*  In relying on that ruling and VE Cottle's

15  testimony, ALJ Underwood found that G.O.'s limitation to overhead reaching was not significant

16  enough to preclude all light work.  *Id.*  ALJ Underwood also noted that a "large majority of jobs

17  described by the DOT [Dictionary of Occupational Titles] require little or no reaching above the

18  shoulders."  *Id.*  As such, ALJ Underwood determined that G.O. was capable of making a

19  successful adjustment to other work, and, therefore, was not disabled from September 14, 2015

20  (the date of the previous decision finding him not disabled) to December 31, 2015 (his date last

21  insured).  *Id.* at 23–24.

22         G.O. sought review of ALJ Underwood's decision, which the Appeals Council denied on

23  November 2, 2018.  *See id.* at 3.  G.O. then requested judicial review and filed his appeal in this

24  Court on April 4, 2019.  *See* Compl. (dkt. 1) ¶¶ 2–3.

25         **D.      The Parties' Arguments**

26                **a.  G.O.'s Motion for Summary Judgment**

27         G.O.'s motion for summary judgment requests that the Court reverse the Commissioner's

28  final decision or remand the matter pursuant to 42 U.S.C. § 405(g).  Pl.'s Mot. at i.  G.O. presents

United States District Court
Northern District of California

18

1    three main arguments: (1) ALJ Underwood erred in applying a continuing presumption of non-

2    disability when there were changed circumstances in the form of both medical and vocational

3    evidence; (2) ALJ Underwood erred in discrediting VE Coughlin's testimony; and (3) ALJ

4    Underwood failed to provide clear and convincing reasons for discrediting G.O.'s testimony.  *Id.*

5    at 1.

6           First, G.O. contends that ALJ Underwood erred in applying a presumption of non-

7    disability when substantial evidence demonstrated changed circumstances after the 2015

8    administrative decision.  *Id.* at 3.  G.O. argues that the new, material evidence presented to ALJ

9    Underwood demonstrated that G.O.'s "functional capacity and the availability of employment was

10   more limited" than found by ALJ Parnow in September 2015.  *Id.* at 4 (citing *Stubbs-Danielson v.*

11   *Astrue*, 539 F.3d 1169 (9th Cir. 2008); *Lester v. Chater*, 81 F.3d 821 (9th Cir. 1996); *Chavez v.*

12   *Bowen*, 844 F.2d 691 (9th Cir. 1988)).  This new evidence included the November 2015 MRI,

13   December 2015 surgery and subsequent treatment, and VE Coughlin's testimony at the 2017

14   hearing.  *Id.*  Specifically, the November 2015 MRI showed a "worsening" of G.O.'s condition, as

15   well as a new diagnosis of AC joint arthrosis, subacromial impingement syndrome, possible

16   adhesive capsulitis, rotator cuff tear, and degeneration of the biceps tendon.  *Id.* at 7–8.  G.O. also

17   presented evidence that he underwent surgery to mitigate his worsening right shoulder condition,

18   showing a change in circumstances from conservative to "very aggressive" treatment.  *Id.* at 8.

19   The new evidence also included VE Coughlin's testimony that G.O.'s limitation on overhead

20   reaching would preclude the full range of light, unskilled work.  *Id.* at 8–9.  G.O. asserts that the

21   combined effect of the new evidence demonstrated that his condition was "more severe" than ALJ

22   Parnow determined in 2015 and that he could not have worked during the relevant period.  *Id.* at 7.

23   As such, G.O. argues that he successfully rebutted a presumption of non-disability and ALJ

24   Underwood was required to make a new finding regarding his alleged disability.  *Id.*

25           G.O. also argues that ALJ Underwood erred in relying on irrelevant facts to discredit VE

26   Coughlin's testimony.  *Id.* at 9.  G.O. argues that it was improper for ALJ Underwood to rely on

27   VE Cottle's testimony from 2015 because ALJ Underwood was not at the 2015 hearing, nor was

28   VE Cottle's testimony part of the administrative record available to her.  *Id.* at 10.  Even though

United States District Court
Northern District of California

the Commissioner supplemented the record with the 2015 hearing transcript, G.O. contends that VE Cottle's testimony and qualifications were not part of the record. *Id.* at 11. G.O. similarly disputes ALJ Underwood's interpretation of SSR 85-15, which states that reaching is an "activity required in almost all jobs" and "significant limitations . . . may eliminate a large number of occupations a person could do otherwise." *Id.*; SSR 85-15. G.O. claims that if he is unable to extend his dominant arm in "any direction for two-thirds of the workday" it is reasonable and consistent with SSR 85-15 that light, unskilled work would be largely precluded. Pl.'s Mot. at 10–11. G.O. argues that ALJ Underwood is "not herself a vocational expert and she did not have any evidence in the record" which could discredit VE Coughlin in favor of VE Cottle. *Id.* at 11.

Further, G.O. contends that VE Coughlin's testimony leaves "no serious doubt" as to G.O.'s disability, and, therefore, the credit-as-true analysis should apply. *Id.* at 12. This analysis "permits, but does not require, a direct award of benefits on review but only where the [ALJ] has not provided sufficient reasoning for rejecting testimony and there are no outstanding issues on which further proceedings in the administrative court would be useful." *Id.* (quoting *Leon v. Berryhill*, 800 F.3d 1041, 1044 (9th Cir. 2018)). G.O. asserts that ALJ Underwood erred in discrediting VE Coughlin's testimony because it was neither challenged nor questioned during the hearing; as such, ALJ Underwood failed to provide any valid reason for discrediting it in her decision. *Id.* at 12.

Finally, G.O. argues that ALJ Underwood erred in discrediting G.O.'s own testimony. *Id.* at 13. Specifically, G.O. asserts that an ALJ cannot merely provide a "blanket statement" that some parts of a claimant's testimony were "not entirely consistent with the evidence." *Id.* G.O. claims that ALJ Underwood needed to point to specific statements that she found not credible, and that she erred by only pointing to one such statement, G.O.'s testimony that he could not lift anything more than five pounds with his right arm. *Id.* (citing *Lester*, 81 F.3d at 834).

G.O. asserts that ALJ Underwood's two main reasons for discrediting his testimony were flawed. *Id.* at 14. First, G.O. contends that ALJ Underwood erred in concluding that G.O. was "allegedly providing more hands-on care for his father" than he testified, and in relying on the following three notes in medical reports to reach that conclusion:

1
2
3
4

> January 24, 2015- "Considering surgery but takes care of his father and can't be incapacitated now." (AR 288)
> February 25, 2015- "Doesn't want surgery now as he has to care for father." (AR 292)
> May 18, 2015- "Can't schedule surgery yet due to taking care of father." (AR 325)

5    Pl.'s Mot. at 14.  G.O. asserts that ALJ Underwood should not have based her decision on these

6    notations because they all took place prior to the relevant period between September 14, 2015

7    through December 31, 2015.  *Id.*  Specifically, G.O. states that he proceeded with the

8    recommended surgery on December 14, 2015 and that he cared for his father primarily by

9    "monitoring the other caregivers and being available for emergencies." *Id.*  G.O. asserts that there

10   is no evidence in the record that he was regularly "lifting and carrying" more than five pounds as

11   part of his caregiving responsibilities.  *Id.*

12          Second, G.O. states that ALJ Underwood erred in relying on his low pain levels reported

13   after his operation.  *Id.*  G.O. argues that it is "entirely consistent with [his] testimony" that, while

14   at rest during doctor's appointments, he did not experience high levels of pain, and there is no

15   evidence showing that his doctors asked him "lift and carry anything over five pounds or to extend

16   or reach his arm in any manner." *Id.* at 15.  G.O. asserts that the record evidence demonstrates

17   that he was still experiencing "sharp" and "shooting pain" with certain movements, as well as pain

18   with extending his right arm.  *Id.*  Similarly, G.O. contends that under 20 C.F.R. § 201.04, Part

19   404, Subpart P, Appendix 2, he would have been found "eligible as an individual of advanced age

20   restricted to less than unskilled light work" if his testimony were credited as true.  *Id.*  At the time

21   of ALJ Underwood's decision, G.O. was fifty-five years old, placing him in the advanced age

22   category.  Thus, G.O. argues that it was prejudicial error to discredit his testimony because it was

23   not contradicted by the record and a finding of disability was warranted under 20 C.F.R. § 201.04,

24   Part 404, Subpart P, Appendix 2.  Pl.'s Mot. at 15.

25          **b.  The Commissioner's Cross-Motion for Summary Judgment**

26          The Commissioner's cross-motion for summary judgment requests that the Court affirm

27   the Commissioner's final decision because substantial evidence supports a finding that G.O. failed

28   to prove changed circumstances indicating greater disability and show that he was disabled during

*United States District Court*
*Northern District of California*

21

1    the relevant period.  Comm'r's Mot. (dkt. 15) at 1.  In the alternative, the Commissioner asks the

2    Court to remand the action for additional proceedings instead of awarding benefits.  *Id.* at 15.  The

3    Commissioner presents three main arguments in response to G.O.'s motion: (1) substantial

4    evidence supports ALJ Underwood's application of a presumption of continuing non-disability;

5    (2) substantial evidence supports ALJ Underwood's step five finding that G.O. could perform

6    work available in the national economy despite the limitations of his RFC; and (3) substantial

7    evidence supports ALJ Underwood's evaluation of G.O.'s subjective allegations of disabling

8    symptoms.  *Id.* at 5, 7, 9.

9        First, the Commissioner argues that ALJ Underwood properly applied a presumption of

10    continuing non-disability.  *Id.* at 5.  Specifically, the Commissioner asserts that G.O.'s new

11    evidence failed to demonstrate changed circumstances indicating greater disability.  *Id.* at 6.  The

12    Commissioner argues that the "mere existence of new evidence or a new or worsening impairment

13    alone does not indicate greater disability or rebut the presumption of non-disability," and that G.O.

14    failed to carry his burden to prove that he was disabled and that changed circumstances indicated

15    greater disability.  *Id.* at 6–7.  The Commissioner argues that because G.O. did not rebut the

16    presumption of non-disability, ALJ Underwood was bound by the prior administrative decision.

17    *Id.* at 7.

18        The Commissioner also argues that even if the Court finds that G.O. met his burden and

19    ALJ Underwood erred in applying a presumption of non-disability, substantial evidence still

20    supports ALJ Underwood's findings, especially at step five.  *Id.*  The Commissioner asserts that

21    ALJ Underwood correctly used the expertise of VE Cottle to determine that G.O. could perform

22    other work in the national economy.  *Id.* at 8.  Similarly, the Commissioner argues that the

23    Dictionary of Occupational Titles provides substantial evidence supporting the conclusion that

24    G.O. could perform light, unskilled work in the national economy.  *Id.*  The Commissioner notes

25    that the descriptions of the jobs in the Dictionary of Occupational Titles that VE Cottle determined

26    G.O. could perform "do not indicate more than occasional manipulative activities with both

27    [upper] extremities . . . and there is nothing indicating in the descriptions that any overhead

28    reaching . . . would be required."  *Id.* at 9 (citing Dictionary of Occupational Titles 249.366-010,

United States District Court
Northern District of California

1  569.686.046, 524.687-022).  Thus, according to the Commissioner, because substantial evidence

2  supports a finding that G.O. could perform the jobs identified by VE Cottle, ALJ Underwood's

3  step five finding should be upheld.  *Id.*

4  Finally, the Commissioner argues that substantial evidence supports ALJ Underwood's

5  evaluation that G.O.'s testimony was inconsistent with the record.  *Id.* at 9–10.  In making this

6  argument, the Commissioner points to ALJ Underwood's "valid reasons based on substantial

7  evidence" for finding G.O.'s testimony inconsistent with the record, including: (1) a lack of

8  objective medical evidence supporting G.O.'s allegations of disabling symptoms;

9  (2) inconsistencies in G.O.'s statements and conduct, namely taking care of his father, that

10  contradict his testimony of subjectively disabling symptoms; (3) G.O.'s conservative treatment

11  and repeated deferrals of surgical intervention; and (4) inconsistencies between G.O.'s allegations

12  and several medical opinions.  *Id.* at 10, 11, 13, 14.  According to the Commissioner, ALJ

13  Underwood was "entitled to and properly weighed [G.O.'s] activities and statements regarding his

14  ability to engage in activities" in determining that his testimony was not reliable.  *Id.* at 12.  The

15  Commissioner claims that if G.O. is capable of spending a "substantial part of his day engaged in

16  pursuits involving the performance of physical functions that are transferable to a work setting," a

17  specific finding as to this fact may be enough to discredit his allegations of disabling pain.  *Id.*

18  (quoting *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989)).

19  Additionally, the Commissioner argues against G.O.'s proposed application of the credit-

20  as-true rule.  *Id.* at 15.[6]  According to the Commissioner, the Ninth Circuit clarified that the credit-

21  as-true rule "only justifies an award of benefits in narrow circumstances."  *Id.* (citing *Treichler v.*

22  *Comm'r of Soc. Sec.*, 775 F.3d 1090, 1099–1102 (9th Cir. 2014)).  The Commissioner asserts that

23  unless the Court finds that further administrative hearings would "serve no useful purpose and . . .

24  that all factual conflicts are resolved," the matter may not be remanded with instruction to provide

25  benefits.  *Id.*  The Commissioner asserts that there are significant conflicts in the evidence, such as

26

27  _____

28  [6] The Commissioner also notes for the record his objection to the credit-as-true rule in principle, but does not dispute that this Court is bound by Ninth Circuit precedent applying that rule.  *See* Comm'r's Mot. at 15.

1    G.O.'s repeated deferrals of surgery, caregiving responsibilities, and reported improvements in his

2    condition before the date last insured. *Id.* at 15–16. As such, the Commissioner submits that if the

3    Court finds remand necessary, the Court should remand for further administrative proceedings and

4    not for an award of benefits. *Id.* at 16.

5            **c.   G.O.'s Reply Memorandum**

6            G.O.'s reply addresses largely the same issues as his motion, and requests that the Court

7    reverse the Commissioner's final decision, or remand the matter for payment of benefits or further

8    proceedings. *See generally* Reply (dkt. 16) at 1.

9            G.O. again argues that ALJ Underwood erred in applying a presumption of non-disability

10   when substantial evidence demonstrated changed circumstances after the 2015 administrative

11   decision. *Id.* at 2. According to G.O., under the Ninth Circuit standard, he successfully rebutted

12   the presumption of non-disability because he presented new and material evidence to ALJ

13   Underwood that was not available for the prior hearing. *Id.* (citing *Stubbs-Danielson*, 539 F.3d at

14   1173; *Chavez*, 844 F.2d at 694). As such, G.O. argues that ALJ Parnow's findings from 2015

15   were not entitled to preclusive effect. *Id.* Further, G.O. asserts that the Commissioner failed to

16   specifically address the findings of the November 2015 MRI, December 2015 surgery, and G.O.'s

17   new RFC as relevant, changed circumstances. *Id.* at 3. G.O. asserts that the new evidence

18   presented to ALJ Underwood successfully rebutted the presumption of non-disability and required

19   her to make new findings. *Id.* at 4.

20           G.O. also reiterates his argument that substantial evidence did not support ALJ

21   Underwood's step five finding. *Id.* Specifically, G.O. asserts that VE Coughlin's testimony was

22   new information not presented to ALJ Parnow, making ALJ Underwood's reliance on VE Cottle's

23   testimony instead unjustified. *Id.* According to G.O., the only evidence of VE Cottle's testimony

24   presented to ALJ Underwood was what was included in the 2015 administrative decision; neither

25   his qualifications nor actual testimony was available at the time of her decision. *Id.* at 5–6. G.O.

26   argues that neither ALJ Underwood nor the Commissioner provided sufficient reasoning for

27   rejecting VE Coughlin's testimony. *Id.* at 7. Thus, G.O. contends that because substantial

28   evidence supports VE Coughlin's testimony that his disability precludes all light, unskilled work,

United States District Court
Northern District of California

24

1  the presumption of non-disability was successfully rebutted.  *Id.*

2        Further, G.O. restates his contention that ALJ Underwood erred in discrediting his

3  testimony.  *Id.*  According to G.O., there is no clear evidence in the record that his actual activities,

4  like caring for his father and deferring surgery, or medical evidence, such as conservative

5  treatment and reported pain levels, contradict his testimony.  *Id.* at 9.  Specifically, G.O. argues

6  that deferring surgery cannot still be a valid reason for discrediting his testimony because he

7  underwent surgery prior to his date last insured and the second hearing.  *Id.*  G.O. also asserts that

8  opinions of non-examining medical reviewers for Social Security "have never been found to be a

9  clear and convincing reason" for discrediting testimony.  *Id.* at 9–10.  G.O. claims that neither the

10  regulations nor cases cited by the Commissioner support the proposition that a non-examining

11  physician's opinion can provide clear and convincing evidence to discredit a claimant's testimony.

12  *Id.* at 10.  Thus, according to G.O., ALJ Underwood erred in relying on Dr. Bello and Dr.

13  Talcherkar's opinions to discredit G.O.'s testimony.  *Id.*

14        Lastly, G.O. argues again that, under the credit-as-true rule, the matter should be remanded

15  with orders to award benefits.  *Id.* at 7.  G.O. states that the evidence and testimony presented to

16  ALJ Underwood "leaves no serious doubt as to whether [he] was disabled based on the extensive

17  record and the findings of both ALJs that he would be limited to only occasional reaching with his

18  dominant arm."  *Id.*  Further, G.O. argues that because there have already been two hearings and

19  there exist no outstanding issues for further proceedings, the credit-as-true rule should apply.  *Id.*

## III.     ANALYSIS

### A.     Legal Standard

22        District courts have jurisdiction to review the final decisions of the Commissioner and may

23  affirm, modify, or reverse the Commissioner's decisions with or without remanding for further

24  hearings.  42 U.S.C. § 405(g); *see also* 42 U.S.C. § 1383(c)(3).

25        When reviewing the Commissioner's decision, the Court takes as conclusive any findings

26  of the Commissioner that are free of legal error and supported by "substantial evidence."

27  Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a

28  conclusion" and that is based on the entire record.  *Richardson v. Perales*, 402 U.S. 389, 401

1    (1971). "'Substantial evidence' means more than a mere scintilla," *id.*, but "less than a

2    preponderance." *Desrosiers v. Sec'y of Health & Human Servs.*, 846 F.2d 573, 576 (9th Cir.

3    1988) (citation omitted).  Even if the Commissioner's findings are supported by substantial

4    evidence, the decision should be set aside if proper legal standards were not applied when

5    weighing the evidence.  *Benitez v. Califano*, 573 F.2d 653, 655 (9th Cir. 1978) (quoting *Flake v.*

6    *Gardner*, 399 F.2d 532, 540 (9th Cir. 1978)).  In reviewing the record, the Court must consider

7    both the evidence that supports and the evidence that detracts from the Commissioner's

8    conclusion.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996) (citing *Jones v. Heckler*, 760

9    F.2d 993, 995 (9th Cir. 1985)).

10          If the Court identifies defects in the administrative proceeding or the ALJ's conclusion, the

11    Court may remand for further proceedings or a calculation of benefits.  *See Garrison v. Colvin*,

12    759 F.3d 995, 1019–21 (9th Cir. 2014).

13          **B.**    **The ALJ Erred in Applying a Presumption of Non-Disability**

14          Evidence presented during the 2017 hearing, specifically the November 2015 MRI and

15    December 2015 surgery, was new and material under the Ninth Circuit standard, and G.O.

16    successfully rebutted the presumption of continuing non-disability.  As such, ALJ Underwood

17    erred in finding that G.O. failed to prove changed circumstances.

18          In the Ninth Circuit, an ALJ's finding that a claimant is not disabled "create[s] a

19    presumption that [the claimant] continued to be able to work after that date."  *Lester*, 81 F.3d at

20    827 (quoting *Miller v. Heckler*, 770 F.2d 845, 848 (9th Cir. 1985)).  While the principles of res

21    judicata apply to administrative decisions, the doctrine is applied less rigidly to administrative

22    proceedings than to judicial proceedings.  *Chavez*, 844 F.2d at 693.  To overcome this

23    presumption, a claimant must prove "changed circumstances indicating a greater disability."  *Id.*

24    (quoting *Taylor v. Heckler*, 765 F.2d 872, 875 (9th Cir. 1985)); *see also* Acquiescence Ruling 97-

25    4(9), 1997 WL 742758, at *3 (Dec. 3, 1997) ("A claimant may rebut the presumption by showing

26    a 'changed circumstance' affecting the issue of disability with respect to the unadjudicated period,

27    e.g., a change in the claimant's age category under 20 CFR 404.1563 or 416.963, an increase in

28    the severity of the claimant's impairment(s), the alleged existence of an impairment(s) not

United States District Court
Northern District of California

previously considered, or a change in the criteria for determining disability."). Under *Chavez*, even if a claimant rebuts the continuing presumption of non-disability after a prior final administrative decision, the Court is still required to give effect to certain findings contained in the prior ALJ's decision, including findings in the five-step evaluation process for determining disability. *See* Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3. However, if the claimant produces "new and material evidence" that was not presented to the prior ALJ, the presumption of non-disability will be successfully rebutted and the prior ALJ's findings will not be entitled to res judicata consideration. *Id.* In Acquiescence Ruling 97-4(9), the Social Security Administration explained this rule as follows:

> If the claimant rebuts the presumption, adjudicators then must give effect to certain findings . . . contained in the final decision by an ALJ or the Appeals Council on the prior claim, when adjudicating the subsequent claim. For this purpose, the Ruling applies only to a finding of a claimant's residual functional capacity, education, or work experience, or other finding required at a step in the sequential evaluation process for determining disability provided under 20 CFR 404.1520, 416.920 or 416.924, or a finding required under the evaluation process for determining disability provided under 20 CFR 404.1578, as appropriate, which was made in the final decision in the prior disability claim. Adjudicators must adopt such a finding from the final decision on the prior claim in determining whether the claimant is disabled with respect to the unadjudicated period unless there is new and material evidence relating to such a finding or there has been a change in the law, regulations or rulings affecting the finding or the method for arriving at the finding.

*Id.* Evidence is considered "material" when it "bear[s] directly and substantially on the matter" and "there is a reasonable possibility that the new evidence would have changed the outcome." *Walters v. Colvin*, 213 F. Supp. 3d 1223, 1226–27 (N.D. Cal. 2016) (quoting *Luna v. Astrue*, 623 F.3d 1032, 1033 (9th Cir. 2010)); *see also* HALLEX I-5-4-60 ("[N]ew evidence is 'material' if, for the purposes of adjudicating the current claim, the evidence warrants a finding on residual functional capacity, education, work experience or other findings required at a step in the sequential evaluation process different than that made in the decision on the prior claim."). Using this standard, the second ALJ must "determine whether [the claimant's] current circumstances [are] different from those found by the first ALJ." *Draiman v. Berryhill*, No. CV 17-747-KS (KLS), 2018 WL 895445, at *4 (C.D. Cal. Feb. 13, 2018) (quoting *Johnson v. Astrue*, 358 F.

1   App'x 791, 792 (9th Cir. 2009)).

2          When using new evidence to rebut the presumption of non-disability, some courts in the

3   Ninth Circuit found that medical evaluations conducted after the first disability determination

4   "necessarily present new and material information not presented to the first ALJ." *Cubilo v.*

5   *Astrue*, No. CV 10-9709 (AGR), 2012 WL 273754, at *2 (C.D. Cal. Jan. 31, 2012) (quoting

6   *Stubbs-Danielson*, 539 F.3d at 1173).  Additionally, some courts require the claimant to point to

7   "specific" evidence showing changed circumstances.  *Kim D.W. v. Saul*, No. 2:19-CV-01689-

8   AFM (AFM), 2020 WL 868605, at *5 (C.D. Cal. Feb. 20, 2020) ("While Plaintiff summarizes the

9   new evidence, he fails to point to any specific medical evidence supporting his allegation that his

10  medical condition worsened."); *see also Pearson v. Sec'y of Health & Human Servs.*, 780 F. Supp.

11  682, 686 (E.D. Cal. 1991) (finding that the claimant failed to show changed circumstances because

12  he did not present any medical evidence showing a deterioration of his condition).  For example,

13  the court in *Woods v. Astrue* found that the claimant's new medical evidence, specifically several

14  assessments from various doctors, presented during the second hearing showed a worsening of her

15  condition, and therefore changed circumstances.  No. ED CV 10-1306-CW (CMW), 2011 WL

16  2563236, at *4 (C.D. Cal. June 29, 2011) (recognizing a claimant's decreased lack of functional

17  movement of the right upper extremity since her first disability application process as changed

18  circumstances).  Similarly, in *Ruiz v. Astrue*, the claimant successfully proved changed

19  circumstances by presenting new, material evidence indicative of worsened symptoms, as well as

20  a new diagnosis.  No 10cv2023-MMA (BGS), 2012 WL 3779039, at *8 (S.D. Cal. July 20, 2012).

21         The Commissioner contends that G.O.'s new evidence fell short of demonstrating changed

22  circumstances indicative of greater disability and that the "mere existence" of new evidence or

23  worsening impairment alone cannot rebut the presumption of non-disability.  *Id.* at 6–7.  However,

24  in making this argument, the Commissioner misconstrues the Ninth Circuit standard.  Specifically,

25  the standard holds that if the claimant presents "new and material evidence," the presumption of

26  non-disability is rebutted.  *See* Acquiescence Ruling 97-4(9), 1997 WL 742758, at *3; *Chavez*,

27  844 F.2d at 693.

28         Here, the new evidence presented to ALJ Underwood demonstrated a worsening of G.O.'s

United States District Court
Northern District of California

28

condition during the relevant period and sufficiently illustrated changed circumstances regarding his shoulder impairment.  AR at 364 (November 2015 MRI results), 362 (December 2015 surgery).  Under *Stubbs-Danielson*, because G.O. presented medical evidence that postdated the prior administrative hearing, this evidence "necessarily presented new and material information not presented to the first ALJ."  539 F.3d at 1173; *see also Cubilo*, 2012 WL 273754, at *2.

First, the November 2015 MRI suggested a "high-grade partial tear" and that G.O.'s condition was worse than previously determined, both by prior medical examinations and ALJ Parnow.  AR at 345 ("His MRI scan is worst [sic] than that of several years ago.").  The MRI also resulted in a new diagnosis of "moderate to severe arthrosis" with "hypertrophy and edema" across the AC joint.  *Id.*  ALJ Underwood later used this diagnosis to make a new step two finding regarding G.O.'s severe impairment, "right rotator cuff tear with arthrosis of the AC joint, status post subacromial decompression," which differed from ALJ Parnow's prior finding of "right shoulder injury with residual pain."  *Id.* at 18 (ALJ Underwood's finding), 69 (ALJ Parnow's finding).  Similar to the claimant in *Woods*, G.O.'s MRI is a specific assessment indicating a worsening of his impairment during the relevant period.  *See Woods*, 2011 WL 2563236, at *4.  Further, like in *Ruiz*, because the MRI indicated worsened symptoms and furnished a new diagnosis, it sufficiently illustrated changed circumstances.  *See Ruiz*, 2012 WL 3779039, at *8.  Thus, the November 2015 MRI demonstrated a worsening of G.O.'s condition during the relevant period.

Similarly, the December 2015 surgery marked a change in G.O.'s treatment from conservative to aggressive.  AR at 73–74, 362.  ALJ Underwood cited the fact that G.O. repeatedly deferred surgery as a reason for her unfavorable ruling, just as ALJ Parnow had done in 2015.  *Id.* at 22 (ALJ Underwood), 74 (ALJ Parnow).  However, ALJ Underwood erred in making this finding, as G.O. no longer relied solely on conservative treatment and went through with the surgery on December 14, 2015.  *Id.* at 345, 362.  The fact that G.O. *previously* relied on more conservative treatment, but more recently felt the need for surgery, is consistent with a worsening impairment.  Considering this medical evidence, ALJ Underwood erred in determining that G.O. failed to demonstrate a material change in his condition from September 14, 2015 to December 31,

2015.

The Court need not address the question of whether new and different testimony from a vocational expert can also establish changed circumstances, because both the November 2015 MRI and the December 2015 surgery sufficiently demonstrate a worsening of G.O.'s impairment, thereby rebutting the presumption of non-disability.

### C.   The ALJ Erred in Relying on VE Cottle over VE Coughlin

The Court finds that ALJ Underwood failed to provide sufficient reasons to rely on VE Cottle's testimony from the prior hearing over VE Coughlin's testimony at ALJ Underwood's own hearing.  VE Cottle testified before ALJ Parnow in August of 2015 that someone with the RFC assessed by both ALJ Parnow and, later, ALJ Underwood—which included a restriction to only occasional reaching with the right arm—could perform work available in the national economy. AR at 510–11.  In contrast, VE Coughlin testified in 2017 before ALJ Underwood that the limitation to occasional reaching with the dominant arm, in conjunction with a restriction to light unskilled work, would rule out any available jobs.  *Id.* at 60–61.

Courts in the Ninth Circuit have held that ALJs may rely on the opinion of a VE at a *subsequent* hearing without addressing testimony from a different VE at an *earlier* hearing. *Ramirez v. Comm'r of Soc. Sec. Admin.*, 463 F. App'x 640, 643 (9th Cir. 2011) ("[D]espite the ALJ's lack of explanation for not relying on the testimony of the unavailable vocational expert from the first hearing, the ALJ properly relied on the vocational expert's testimony at the second hearing . . . ."); *Helen Jean P. v. Comm'r of Soc. Sec.*, No. 1:18-CV-03236-RHW, 2020 WL 3619517, at *6 (E.D. Wash. Mar. 9, 2020); *Villa v. Astrue*, No. CV 11-8992-OP (OP), 2012 WL 2847730, at *3 (C.D. Cal. July 11, 2012) ("[T]he ALJ properly relied on the testimony of Ms. Trost, the VE in the second hearing . . . . Thus, the ALJ made no error in failing to address the testimony of Ms. Schneider, the VE from the prior hearing."), *aff'd sub nom. Villa v. Colvin*, 540 F. App'x 639 (9th Cir. 2013).  Courts have also allowed ALJs to rely on a VE's testimony from an earlier hearing before a different ALJ if the claimant's RFC has not changed, but those decisions do not indicate that the record included—and the ALJ disregarded—contradictory VE testimony at a more recent hearing.  *See, e.g.*, *Paulson v. Astrue*, 368 F. App'x 758, 760 (9th Cir. 2010); *Ramey*

30

*v. Colvin*, No. 7:15-CV-242, 2016 WL 4529787, at *2 (W.D. Va. Aug. 3, 2016), *recommendation adopted*, 2016 WL 4532414 (W.D. Va. Aug. 29, 2016).

The district court's decision in *Villa* includes broad dicta that, "[i]f the ALJ properly relied on the testimony of one VE, he need not address the testimony of another VE." *Villa*, 2012 WL 2847730, at *3. This Court is aware of no decision applying that standard where an ALJ rejects *more recent* VE testimony in favor of testimony from a previous hearing. Under the circumstances here, where VE Cottle testified before the relevant period of September 2015 through December 2015 occurred and VE Coughlin testified after it, the Court holds that the ALJ must provide a valid explanation, supported by substantial evidence, for crediting the earlier VE's opinions over contradictory testimony at a more recent hearing.

ALJ Underwood provided two reasons for crediting VE Cottle over VE Coughlin. First the ALJ asserted that Social Security Ruling 85-15 "states that only significant limitations of reaching may eliminate a large number occupations that a person could otherwise do," and determined that G.O.'s limitation to only occasional reaching was not "significant" and thus would not be expected to eliminate a large number of jobs. AR at 23. That ruling in fact provides that "[s]ignificant limitations of reaching or handling . . . may eliminate a large number of occupations a person could otherwise do" because "[r]eaching . . . and handling . . . are activities required in almost all jobs." SSR 85-15, 1985 WL 56857, at *7. It does not state that lesser restrictions on reaching cannot also eliminate a large number of jobs, much less in conjunction with other limitations. To the contrary, the ruling emphasizes that a vocational specialist's assistance may be necessary to determine how lesser limitations on reaching affect a claimant's ability to work. *See id.* Notably, the Commissioner has not defended ALJ Underwood's reliance on Social Security Ruling 85-15. The Court holds that ALJ Underwood erred in interpreting that ruling as supporting VE Cottle's testimony over VE Coughlin's.

Second, ALJ Underwood asserted that the Dictionary of Occupational Titles ("DOT") supports VE Cottle's opinion that certain light, unskilled occupations would be available for someone limited to occasional reaching with their dominant arm, and undermines VE Coughlin's testimony to the contrary, because "the performance of the large majority of jobs described by the

1   DOT requires little or no reaching above the shoulders." AR at 23. As a starting point, the ALJ

2   did not assess G.O.'s RFC as only permitting occasional reaching "above the shoulders," she

3   limited him to occasional reaching *of any kind* with his right arm, and no overhead reaching. *Id.* at

4   18–19. The ALJ did not address whether the DOT would allow for light, unskilled work with no

5   more than occasional reaching with the dominant arm.

6          Moreover, although not addressed in the parties' briefs, the Ninth Circuit has addressed

7   conflicts between the DOT and vocational expert's testimony:

> When there is an apparent conflict between the vocational expert's
> testimony and the DOT—for example, expert testimony that a
> claimant can perform an occupation involving DOT requirements
> that appear more than the claimant can handle—the ALJ is required
> to reconcile the inconsistency. *Massachi v. Astrue*, 486 F.3d 1149,
> 1153–54 (9th Cir. 2007). The ALJ must ask the expert to explain the
> conflict and "then determine whether the vocational expert's
> explanation for the conflict is reasonable" before relying on the
> expert's testimony to reach a disability determination. *Id.*; *see also*
> Social Security Ruling 00-4P, 2000 WL 1898704, at *2 (Dec. 4,
> 2000). The ALJ's failure to resolve an apparent inconsistency may
> leave us with a gap in the record that precludes us from determining
> whether the ALJ's decision is supported by substantial evidence. *See
> Massachi*, 486 F.3d at 1154 (stating that "we cannot determine
> whether the ALJ properly relied on [the vocational expert's]
> testimony" due to unresolved occupational evidence).

17  *Zavalin v. Colvin*, 778 F.3d 842, 846 (9th Cir. 2015) (alteration in original); *see also, e.g.*, *Rounds

18  v. Comm'r of Soc. Sec. Admin.*, 807 F.3d 996, 1003 (9th Cir. 2015). Although cases applying that

19  rule have generally addressed claimants' arguments that an ALJ erred in *relying* on a vocational

20  expert's testimony, Ninth Circuit precedent—quoting a Social Security Ruling—provides that

21  "'[n]either the [*Dictionary of Occupational Titles* ] nor the [vocational expert] . . . evidence

22  automatically "trumps" when there is a conflict.'" *Massachi*, 486 F.3d at 1153 (quoting SSR

23  00-4P) (alterations in original). Accordingly, even if the DOT conflicted with VE Coughlin's

24  testimony, the ALJ would have been required to ask VE Coughlin to address such discrepancies

25  before rejecting her testimony on that basis. *See id.*; *Zavalin*, 778 F.3d at 846. The ALJ did not

26  raise any discrepancy between VE Coughlin's testimony and the DOT at the hearing, nor

27  otherwise invite any explanation of the grounds for VE Coughlin's conclusions. *See* AR at 60–61.

28          The ALJ therefore erred in failing to present valid reasons, supported by substantial

32

1    evidence, for crediting VE Cottle's earlier testimony over VE Coughlin's testimony at the hearing

2    on G.O.'s present application.

3         **D.    The ALJ Erred in Discrediting G.O.'s Testimony**

4         ALJ Underwood improperly discredited G.O.'s testimony.  Specifically, ALJ Underwood

5    erred in applying the two-step analysis under *Vasquez v. Astrue*, and her additional reasons for

6    discrediting his testimony are not based on substantial evidence.

7         In evaluating the credibility of a claimant's testimony, the ALJ is required to engage in a

8    two-step analysis.  *Vasquez v. Astrue*, 572 F.3d 586, 591 (9th Cir. 2009).  First, the ALJ must

9    determine whether the claimant has presented "objective medical evidence of an underlying

10    impairment which could reasonably be expected to produce the pain or other symptoms alleged."

11    *Lingenfelter v. Astrue*, 504 F.3d 1028, 1036 (9th Cir. 2007) (internal quotation marks and citation

12    omitted); *see also Berry v. Astrue*, 622 F.3d 1228, 1234 (9th Cir. 2010) ("Once the claimant

13    produces medical evidence of an underlying impairment, the Commissioner may not discredit the

14    claimant's testimony as to subjective symptoms merely because they are unsupported by objective

15    evidence." (internal quotation marks and citation omitted)).  At this step, the claimant is merely

16    required to show that their impairment "could reasonably have caused some degree" of their

17    symptoms.  *Vasquez*, 572 F.3d at 591 (quoting *Smolen*, 80 F.3d at 1282).  The claimant is not

18    required to demonstrate that their impairment "could reasonably be expected to cause the severity"

19    of the symptoms they allege."  *Id.*

20         Second, if the claimant satisfies the first step and there is no evidence of malingering, the

21    ALJ can only reject the claimant's testimony about the severity of their symptoms by offering

22    "specific, clear, and convincing reasons for doing so."  *Lingenfelter*, 504 F.3d at 1036; *Vasquez*,

23    572 F.3d at 591–93 (holding that the ALJ failed to provide "specific, clear, and convincing"

24    reasons to discredit the claimant's testimony); *Lester*, 81 F.3d at 834; *see also Dodrill v. Shalala*,

25    12 F.3d 915, 918 (9th Cir. 1993); *Swenson v. Sullivan*, 876 F.2d 683, 687 (9th Cir. 1989).  During

26    this stage of the analysis, "general findings are insufficient; rather, the ALJ must identify what

27    testimony is not credible and what evidence undermines the claimant's complaints."  *Berry*, 622

28    F.3d at 1234; *see also Lester*, 81 F.3d at 834.  "Although the ALJ's analysis need not be extensive,

*United States District Court*
*Northern District of California*

33

1    the ALJ must provide some reasoning in order for us to meaningfully determine whether the

2    ALJ's conclusions were supported by substantial evidence." *Treichler*, 775 F.3d at 1103.  These

3    reasons must be "sufficiently specific to permit the court to conclude that the ALJ did not

4    arbitrarily discredit claimant's testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir.

5    2002).

6           When weighing a claimant's credibility, the ALJ may consider the claimant's "reputation

7    for truthfulness, inconsistencies either in his testimony or between his testimony and his conduct,

8    his daily activities, his work record, and testimony from physicians and third parties concerning

9    the nature, severity, and effect of the symptoms of which he complains." *Light v. Soc. Sec.*

10   *Admin.*, 119 F.3d 789, 792 (9th Cir. 1997) (citing *Smolen*, 80 F.3d at 1284); *see also Bunnell v.*

11   *Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991) (citing SSR 88-13).  Similarly, the Ninth Circuit has

12   also held that evidence of "'conservative treatment' is sufficient to discount a claimant's testimony

13   regarding severity of an impairment." *Parra v. Astrue*, 481 F.3d 742, 751 (9th Cir. 2007) (quoting

14   *Johnson*, 60 F.3d at 1434); *see also Meanel*, 172 F.3d at 1114 ("[The claimant's] claim that she

15   experienced pain approaching the highest level imaginable was inconsistent with the 'minimal,

16   conservative treatment' that she received.").  This is especially true when the record indicates that

17   the claimant responded well to that treatment.  *See Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th

18   Cir. 2008) ("The record reflects that [the claimant] responded favorably to conservative treatment

19   . . . . Such a response to conservative treatment undermines [the claimant's] reports regarding the

20   disabling nature of his pain."); *Cubilo*, 2012 WL 273754, at *10 (finding that conservative

21   treatment was a clear and convincing reason to discredit a claimant's testimony because she

22   responded well to conservative treatment and did not require "strong pain medications,

23   participation in a pain treatment program, aggressive exercises or physical therapy, or

24   immobilization of her left upper extremity").

25          However, the Ninth Circuit has repeatedly warned that ALJs must be "especially cautious

26   in concluding that daily activities are inconsistent with testimony about pain, because impairments

27   that would unquestionably preclude work and all the pressures of a workplace environment will

28   often be consistent with doing more than merely resting in bed all day." *Garrison*, 759 F.3d at

United States District Court
Northern District of California

34

1016.  In determining whether to reject the claimant's testimony in *Garrison v. Colvin*, the court

held the following:

> It is an error to reject a claimant's testimony merely because symptoms wax and wane in the course of treatment.  Cycles of improvement and debilitating symptoms are a common occurrence, and in such circumstances it is error for an ALJ to pick out a few isolated instances of improvement over a period of months or years and to treat them as a basis for concluding a claimant is capable of working.

*Garrison*, 759 F.3d at 1017 (citing *Holohan v. Massanari*, 246 F.3d 1195, 1205 (9th Cir. 2001));

*see also Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998) ("Several courts, including this one,

have recognized that disability claimants should not be penalized for attempting to lead normal

lives in the face of their limitations. . . . Only if the level of activity were inconsistent with

Claimant's claimed limitations would these activities have any bearing on Claimant's

credibility."); *Smolen*, 80 F.3d at 1287 n.7 ("The Social Security Act does not require that

claimants be utterly incapacitated to be eligible for benefits, and many home activities may not be

easily transferable to a work environment where it might be impossible to rest periodically or take

medication."); *Fair*, 885 F.2d at 603.

ALJ Underwood "considered G.O.'s testimony and subjective allegations," but determined

that "the evidence during the relevant period does not support the alleged loss of functioning prior

to the date last insured."  AR at 21–22  To the extent that ALJ Underwood provided specific

reasons to reject G.O.'s testimony, they are not convincing.  The only specific reasons that the

ALJ provided were: (1) that "the evidence indicates that he was the primary caretaker for his

father and this was the reason he deferred having his shoulder surgery"; and (2) that "despite

[G.O.'s] allegation of disabling right shoulder pain, his treatment records during the relevant

period indicate that he reported his pain level as low as zero, 1 or 2 on a scale of 1 to 10, and no

higher than a 5."  *Id.* at 22.[7]

---

[7] In asserting that G.O.'s testimony suggested severity beyond that supported by the record, the ALJ also slightly mischaracterized that testimony, writing that G.O. alleged "not being able to lift a gallon of milk," AR at 22, when G.O. in fact testified that he could not do so "at reach" with his right arm, but "[c]lose to the body, you can but I usually don't" because it caused soreness, and to avoid pain he "usually use[d] the other"—his left arm—instead, *id.* at 47–48.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    ALJ Underwood erred in determining that G.O.'s testimony was inconsistent with his

2    caregiving responsibilities for his father.  G.O. testified that he merely monitored his father's

3    caregivers and they took care of all household chores and errands for the family.  *Id.* at 53–54.

4    This testimony is also supported by four hand-written notes from G.O.'s father's caregivers, which

5    neither party addressed in their respective motions for summary judgment.  *Id.* at 281–84.  These

6    notes indicated that the caregivers took care of G.O.'s father morning, afternoon, and night

7    throughout the week; helped his father move around the house, such as going to the bathroom and

8    kitchen; bathed and cleaned up after his father; managed his father's daily activities, like going to

9    medical appointments, and administering medications; took care of all housekeeping needs, like

10   cleaning the bathrooms, floors, windows, cars, dusting and vacuuming throughout the house,

11   outside jobs, and laundry; and prepared all meals for the entire family.  *Id.*  Neither the ALJ's

12   decision nor the Commissioner's brief identifies any evidence that, during the relevant period,

13   G.O.'s caregiving responsibilities for his father went go beyond monitoring and helping during

14   emergencies.  The only purported evidence cited by the ALJ is G.O.'s deferral of surgery,[8] but as

15   discussed above in the context of changed circumstances, whatever inference might be drawn from

16   his previous deferrals does not extend to the period at issue here, in which G.O. *had* surgery.

17   Turning to ALJ Underwood's note that G.O. reported pain levels between zero and two on

18   a ten-point scale, and no higher than five during the relevant period, *see id.* at 22, those metrics

19   appear to describe G.O.'s pain level at rest, not when using his right arm in any particular way, as

20   demonstrated by reports indicating significant pain with certain movements but little to no pain on

21   the ten-point scale.  *See, e.g., id.* at 410 ("He is 8 months post op and he informs me that he is still

22   having pain when he reaches or tries to lift anything heavy.  On a scale of 0-10 with 10 being the

23   highest level, the patient reports their pain level at 0/No Pain." (emphasis omitted)); *id.* at 411

24   ("[H]e informs me that he is still having alot [sic] of pain with extension.  On a scale of 0-10 with

25   10 being the highest level, the patient reports their pain level at 1." (emphasis omitted)).  The

26

27   _____

28   [8] The ALJ cites three notations of G.O. deferring surgery, all of which preceded the prior decision
     and thus fall outside the relevant time period here.  AR at 22 (citing AR at 288 (1/24/2015), 292
     (2/25/2015), 325 (5/18/2015)).

United States District Court
Northern District of California

1    Commissioner identifies no evidence in the record that G.O.'s doctors asked him to perform

2    movements or lift any weight in conjunction with those assessments of his pain level.  The ALJ

3    has not explained how G.O. experiencing little or no pain at rest undermines his testimony

4    regarding his limitations in reaching and lifting.

5         ALJ Underwood also noted, but did not specifically cite in her analysis of G.O.'s

6    credibility, two reports of alleged improvements with physical therapy that occurred outside the

7    relevant period, specifically in August of 2015 (before the previous decision and G.O.'s surgery)

8    when G.O. reported to his physical therapist that this shoulder was feeling "okay," and February

9    of 2016 (after G.O.'s date last insured) when G.O. reported some improvement overall.  *Id.* at 20–

10   21.  While ALJ Underwood discussed the contents of the reports, she did not discuss how they

11   were inconsistent with G.O.'s testimony, or more generally how they demonstrated an ability to

12   reach with his right arm.  Thus, even if the ALJ's citation of those reports could be considered part

13   of her analysis of G.O.'s symptom testimony, the ALJ did not present clear and convincing

14   reasons for discrediting his testimony.

15        Because the ALJ failed to provide clear and convincing reasons to discredit G.O.'s

16   symptom testimony, she erred in concluding that "the evidence during the relevant period does not

17   support the alleged loss of functioning prior to the date last insured."  *See id.* at 21–22.

18        **E.   Remedy**

19        "When the ALJ denied benefits and the court finds error, the court ordinarily must remand

20   to the agency for further proceedings before directing an award of benefits."  *Leon*, 880 F.3d at

21   1045 (citing *Treichler*, 775 F.3d at 1099).  "[A]n ALJ's failure to provide sufficiently specific

22   reasons for rejecting the testimony of a claimant or other witness does not, without more, require

23   the reviewing court to credit the testimony as true."  *Treichler*, 775 F.3d at 1106.  In appropriate

24   circumstances, however, the court may order immediate award of benefits under the Ninth

25   Circuit's "credit-as-true" rule.  *Leon*, 880 F.3d at 1045 (citing *Garrison*, 759 F.3d at 1019).

26        The district court may remand to the ALJ to calculate and award benefits when: (1) "the

27   ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony

28   or medical opinion"; (2) "there are [no] outstanding issues that must be resolved before a disability

1  determination can be made" and "further administrative proceedings would [not] be useful"; and

2  (3) "on the record taken as a whole, there is no doubt as to disability." *Leon*, 880 F.3d at 1045

3  (citations and internal quotation marks omitted); *Varney v. Sec'y of Health & Human Servs.*, 859

4  F.2d 1396, 1401 (9th Cir. 1988) (emphasizing that the credit-as-true rule applies to both claimant

5  testimony and medical opinion evidence); *see also Garrison*, 759 F.3d at 1021 (holding that a

6  district court abused its discretion in declining to apply the "credit as true" rule to an appropriate

7  case). The credit-as-true rule does not apply "when the record as a whole creates serious doubt as

8  to whether the claimant is, in fact, disabled within the meaning of the Social Security Act,"

9  *Garrison*, 759 F.3d at 1021, when "there is a need to resolve conflicts and ambiguities," *Treichler*,

10  775 F.3d at 1101, or when there is ambiguity about when the claimant's disability began that is not

11  solved by the record credited as true. *See Dominguez v. Colvin*, 808 F.3d 403, 409 (9th Cir. 2015).

12  This credit-as-true rule, which is "settled" in the Ninth Circuit, *Garrison*, 759 F.3d at 999, is

13  intended to encourage careful analysis by ALJs, avoid duplicative hearings and burden, and reduce

14  delay and uncertainty facing claimants, many of whom "suffer from painful and debilitating

15  conditions, as well as severe economic hardship." *Id.* at 1019 (quoting *Varney*, 859 F.2d at 1398–

16  99).

17  The Ninth Circuit has applied the credit-as-true rule to "claimant testimony [and] medical

18  opinion." *See Leon*, 880 F.3d at 1045. Here, G.O. asks the Court to apply the credit-as-true rule

19  not only to G.O.'s testimony regarding symptoms, but also to VE Coughlin's testimony regarding

20  jobs that would be available for someone with G.O.'s limitations. The Court is aware of no

21  precedent applying this doctrine to credit a vocational expert's testimony as true where an ALJ

22  rejected that testimony but failed to provide sufficient reasons. Taking into account the Ninth

23  Circuit's admonishment that credit-as-true is a departure from "the ordinary remand rule"

24  appropriate "only in 'rare circumstances,'" *Treichler*, 775 F.3d at 1100 (quoting *Moisa v.*

25  *Barnhart*, 367 F.3d 882, 886 (9th Cir. 2004)), the Court declines to apply the rule in this

26  apparently novel context—particularly given the conflict between VE Coughlin and VE Cottle's

27  earlier testimony, and the insufficiently developed record of whether VE Coughlin's testimony in

28  fact departs from the DOT and if so, what basis she had to do so.

1         Setting aside VE Coughlin's testimony, G.O. argues that his own testimony would be

2 sufficient (if credited as true) to show that he is disabled only in that he "would have been found

3 eligible as an individual of advanced age restricted to less than unskilled light work." Pl.'s Mot. at

4 15 (citing 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00). Neither party addresses that argument

5 further. The regulatory section that G.O. cites pertains to individuals of advanced age restricted to

6 *sedentary* work. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 201.00(d) & tbl. 1. G.O. cites no

7 evidence that he is restricted to sedentary work. Absent any explanation of why a regulation that,

8 by its terms, governs only claimants restricted to sedentary work should apply here when G.O. is

9 not limited to such work, the Court declines G.O.'s invitation to hold him disabled as a matter of

10 law based on that regulation. G.O. offers no other argument why crediting his testimony should

11 warrant remand for an award benefits rather than further administrative proceedings. The Court

12 therefore applies the usual rule and remands for further proceedings.

13 **IV.   CONCLUSION**

14         For the reasons discussed above, G.O.'s motion is GRANTED, the Commissioner's

15 motion is DENIED, and the case is REMANDED for further administrative proceedings

16 consistent with this order. The Clerk shall enter judgment in favor of G.O. and close the file.

17         **IT IS SO ORDERED.**

18 Dated: September 23, 2020

19

20                           JOSEPH C. SPERO
Chief Magistrate Judge

*United States District Court*
*Northern District of California*